UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JENNIFER CAMPINELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| ABBOTT LABORATORIES, INC., | ) |
| | ) |
| Defendant | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jennifer Campinell ("Plaintiff" or "Campinell"), by and through undersigned counsel, hereby complains against Defendant Abbott Laboratories, Inc. ("Defendant" or "Abbott"), as follows:

**JURISDICTION AND PARTIES**

1. This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551 *et seq*, and the Maine Whistleblower Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq*.

2. Plaintiff Campinell is a United States citizen residing in the Town of Durham, County of Androscoggin, and State of Maine.

3. Defendant Abbott is a multinational medical devices and health care company with headquarters in Chicago with locations throughout the United States including in Scarborough, Maine. Abbott is a corporation duly authorized to do business in

1

the State of Maine, operating human specimen laboratories in various locations, with its main campus located in Scarborough, Maine, where Plaintiff worked.

4. Campinell worked for Abbott as a Quality Assurance Engineer.

5. At all times herein relevant, Plaintiff was an "employee" of Abbott as that term is defined under the ADA and the MHRA.

6. Defendant has over on hundred thousand employees.

7. This Court has subject matter jurisdiction over Campinell's claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

8. Plaintiff filed a timely Charge of Discrimination against Defendant with the Maine Human Rights Commission ("MHRC"), alleging that Defendant subjected her to unlawful disability discrimination and retaliation.

9. On December 3, 2025, the MHRC issued a Notice of Right to Sue letter pursuant to 5 M.R.S. § 4621.

## FACTUAL ALLEGATIONS

10. Campinell began working for Abbott in May of 2020 as a Quality Assurance Engineer in Scarborough, Maine. At the time, the position was entirely remote.

11. Campinell suffers from anxiety and depression.

12. Campinell was quickly promoted to a project lead role.

13. Part of the job as the Project Lead in Quality Assurance was to decrease the amount of non-conforming, defective Covid tests from being placed into commerce. Campinell was tasked with creating new processes to prevent such products from leaving Abbott.

14. In December of 2020 Campinell implemented an Impact Assessment Process to evaluate the potential impact or risk of non-conformances (any situation in which specifications are not met or procedures are not followed).

15. The Impact Assessment Process was met with extreme pushback and anger from Production, Engineering, and Quality Assurance.

16. In January of 2021, Campinell implemented a project to ensure Abbott Scarborough Quality Management System ("QMS") was in compliance with requirements.

17. From January to April of 2021, Campinell determined the need to implement a Material Review Board ("MRB") which is a cross-functional team who reviews nonconformance reports to determine appropriate disposition (i.e., what to do with the material). The need for the MRB was based on the historical data (ranging back to the beginning of Covid) to determine what dispositions (rework, use as is, scrap) were used at what frequency.

18. Review found the instances of "Use As Is" (also referred to as Accept for Use - which means instances in which material that does not meet specification is accepted and released into devices or released to consumers without correction of the nonconformance) had a higher disposition. Industry standard and FDA expectations are that this is very rare (less than 10% of lots produced). Abbott Scarborough's rate was approximately 33%. Campinell informed local management and corporate of this issue.

19. Upon presenting the project to Production, Engineering, and QA leadership in spring, 2021 (approximately), Campinell was met with opposition, hostility, and public insults from Nick Namer in front of 40+ managers (including Directors Mary Kluck and Emily Deane, and department heads). Campinell reported the incident to her direct supervisor, John Humpage and to Emily Deane stating the behavior was disgusting and unacceptable. Campinell indicated that she would not work with Namer if this behavior continued. No one reported the issue to Human Resources.

20. However, shortly thereafter Campinell was reported to Human Resources for her presentation because she presented an example situation in which Abbott could have done a better job of documenting a nonconformance report. Campinell did not include names or titles in the presentation and referred generally to "the operator" or "the department."

21. Campinell later presented to corporate leadership, rates of inaccurate and/or poorly performed dispositions, and release of nonconforming material. It was indicated by Campinell and her colleague that this was due to lack of training, lack of personnel qualification, and pressure from corporate to ship product and put it on the market despite the product being defective.

22. Personnel and departments who shipped product and moved reports through extremely quickly were frequently rewarded with praise and bonuses; no bonuses or public praise were provided to personnel who slowed down production in order to ensure product is in conformity with standards, effective, and safe.

23. From December 2021 to February 2022 the project was put on hold to increase Covid test production. During this time, Campinell generated a training program for all personnel who participate in nonconformance reports. Data indicated extreme need for training and lack of understanding of the nonconformance process overall. All training materials and plans were approved by Campinell's manager, John Humpage, as well as Mary Kluck and Emily Deane.

24. Other department heads reiterated their opposition to such measures when implementing the training program, as personnel and managers felt the improved QA processes took too much time.

25. Kluck instructed Campinell to omit mention of the project, the results or documentation within any formal documents in the QMS so that they were not auditable or discoverable by ISO and FDA.

26. Campinell believes Abbott's action with respect to nonconforming product violates 21 CFR 820 and ISO 13485.

27. Campinell reported these concerns to Human Resources.

28. While working at Abbott Campinell often experienced unprofessional and bullying behavior from colleagues and senior management which she believes is based upon her efforts to ensure product compliance and disagreement regarding QA procedures.

29. During one leadership meeting Campinell was publicly insulted by leadership. Campinell was called stupid and told "get out—we don't want you here."

5

On top of the constant name calling, colleagues and management would often yell at Campinell.

30. Campinell's manager, John Humpage, and Human Resources were aware of this unprofessional behavior, but did nothing to address it.

31. In August 2021, Abbott transitioned employees from working remotely to working in the office.

32. This behavior in the office exacerbated Campinell's anxiety symptoms.

33. On August 30, 2021, Campinell requested an accommodation to work remotely four days per week with one day in the office.

34. Campinell believed the request was reasonable as she was able to successfully perform her job duties while working remotely before Abbott required employees to return to the office. Further, even when in the office, all team meetings and communication were via Microsoft Teams and other video conference platforms.

35. On September 7, 2021, Campinell received an email from Human Resources confirming receipt of the request.

36. On September 10, 2021, Campinell provided documentation from her PCP supporting the request for accommodation as requested by the occupational health nurse.

37. On September 10, 2021, the Occupational Health Nurse requested additional information from Campinell's provider to specify the medical condition and provide more detailed information.

38. On October 4, 2021, Campinell met with her PCP to follow up on the request for additional information.

39. On October 6, 2021, Campinell provided the Occupational Health Nurse with the additional documentation from her PCP.

40. On October 7, 2021, the Occupational Health Nurse informed Campinell that she provided all relevant information to Corporate Human Resources.

41. On October 26, 2021, Campinell emailed Human Resources to follow up on the status of her request for accommodation.

42. On October 27, 2021, Human Resources responded, providing that they would fix the lighting in her workspace. Later that day a lamp was removed from the office ceiling.

43. On November 5, 2021, Campinell was provided noise canceling headphones and instructed they were not to leave Abbott.

44. On November 9th, 29th, and December 15th of 2021 Campinell emailed Human Resources to follow up on the request for accommodation to work remotely. Campinell did not receive a response.

45. On December 15, 2021, Campinell had a phone call with a Human Resources case worker. She stated that she believed the company's current hybrid schedule of 4 days in office and 1 day remote was a sufficient accommodation.

46. On December 27, 2021, Campinell received documentation from Human Resources indicating they have reviewed the request and provided

7

appropriate accommodation by way of the headphones and light removal. However, the headphones and lighting were not tailored to the cause of symptoms related to Campinell's disability.

47. On December 28, 2021, Campinell contacted the Occupational Health Nurse to get more information on the status of her request for accommodation, but she was not able to provide any.

48. On December 28, 2021, Campinell emailed Human Resources stating that the accommodations requested with the support of her physician were not provided.

49. On January 1, 2022, Campinell spoke with her manager and requested that she be assigned to a different Human Resources caseworker because of the lack of response and rude, unprofessional behavior during calls from the current caseworker, Nitorshi. However, she was not provided with a different caseworker.

50. Nitorshi disregarded the seriousness of Campinell's condition and was condescending and unsupportive in response to Campinell's request for accommodation.

51. Nitorshi had the same condescending response to Campinell's coworker Jessica Mayhew while going through the request for accommodation process.

52. On February 7, 2022, the Occupational Health Nurse requested a third letter from Campinell's PCP. However, she was not able to provide any criteria or specify the additional information needed.

53. On February 23, 2022, Human Resources notified Campinell that they do not have enough information to review any further accommodation needs.

54. On February 23, 2022, Campinell provided additional information to the Occupational Health Nurse detailing her disabilities of depression and anxiety and how working in the office exacerbates these symptoms. Campinell explained that she had already provided this information to Nitorshi and had another appointment with her PCP set up for March 9, 2022. The nurse agreed to provide the information to Nitorshi, excluding specific medical diagnoses.

55. Campinell was constructively discharged from her position with Abbott because of its failure to accommodate her disability and engaged in the interactive process in good faith.

56. Abbott refused to provide the accommodations Campinell requested and did not take the restrictions seriously.

57. The essential functions of Campinell's position with Abbott could have been performed successfully with the restrictions outlined by her medical provider.

58. Abbott knowingly and willfully violated Campinell's state and federally protected rights.

## COUNT I – DISABILITY DISCRIMINATION UNDER THE ADA
### (42 U.S.C. § 12101 *et seq.*)

59. Plaintiff repeats the allegations contained in Paragraphs 1 through 58 of the Complaint as if fully set forth herein.

60. At all times herein relevant, Campinell was a qualified individual with a disability within the meaning of the ADA.

61. Defendant engaged in unlawful disability discrimination against Campinell in violation of the ADA.

62. Defendant's stated reasons for changing refusing to provide appropriate and effective accommodations for Campinell were pretext for disability discrimination.

63. Defendant regarded Campinell as being disabled.

64. Campinell has a record of a disability.

65. Defendant failed to engage in the appropriate, goodfaith interactive process with Campinell.

66. Defendant failed to provide Campinell with the reasonable accommodations that were necessary for her disability in order to perform the essential functions of her job.

67. As a result of Defendant's discriminatory actions, Campinell has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Jennifer Campinell requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT II – RETALIATION UNDER THE ADA
**(42 U.S.C. § 12101 *et seq*.)**

68. Plaintiff repeats the allegations contained in Paragraphs 1 through 67 of the Complaint as if fully stated herein.

69. Throughout her employment, Defendant retaliated against Campinell for requesting accommodations for her disability.

70. Defendant took adverse action against Campinell for exercising her protected rights under the ADA.

71. As a result of Defendant's retaliatory actions, Campinell has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Jennifer Campinell requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT III – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
**(5 M.R.S. § 4571 *et seq*.)**

72. Plaintiff repeats the allegations contained in Paragraphs 1 through 71 as if fully stated herein.

73. For all of the reasons set forth in Count I above, unlawful discrimination against Plaintiff has taken place within the meaning of the Maine Human Rights Act.

74. For all of the reasons set forth in Count II above, unlawful retaliation against Plaintiff has taken place within the meaning of the Maine Human Rights Act.

WHEREFORE, Plaintiff Jennifer Campinell requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT IV – VIOLATION OF THE MAINE WHISTLEBLOWER PROTECTION ACT
**(26 M.R.S. § 831 *et seq*.)**

75. Plaintiff repeats the allegations contained in Paragraphs 1 through 71 as if fully stated herein.

76. Campinell engaged in protected activity within the meaning of the Maine Whistleblower Protection Act by opposing and complaining of Abbott placing nonconforming product into commerce against regulation and decreasing the efficacy of national and global safety efforts to reduce the spread of Covid via home testing during the peak of the pandemic.

77. Campinell engaged in the aforementioned protected activity in good faith.

78. Abbott took adverse action against Campinell because of her protected whistleblower activity by refusing to provide reasonable accommodations, reporting her to human resources, and treating her with public disdain and harassment whereby exacerbating her anxiety and depression symptoms.

79. The aforementioned instance of protected conduct bears a causal relationship to the adverse employment action(s) alleged herein.

80. As a result of the Abbott's whistleblower retaliation, Campinell has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, civil penal damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Jennifer Campinell requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, civil penal damages, punitive or liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## JURY TRIAL DEMAND

Plaintiff Jennifer Campinell hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated: February 3, 2025  /s/ Laura H. White

_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
lwhite@whiteandquinlan.com


/s/ *Danielle Quinlan*

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21

Kennebunk, ME 04043
(207) 502-7484
*dquinlan@whiteandquinlan.com*

14